## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WESTFIELD GROUP,                            )
                                            )
    Plaintiff,                            )
                                            )
    v.                                    )          **2:02cv997**
                                            )          **Electronic Filing**
MARK R. CAMPISI, individually and           )
doing business as USA FINANCIAL             )
SERVICES, INC., and doing business          )
as BANKER'S FINANCIAL SERVICES,             )
INC., and doing business as ATLANTIC        )
CREDIT, INC.,                               )
                                            )
    Defendants.                           )

## OPINION

CERCONE, D.J.

Westfield Group ("Westfield" or "plaintiff") commenced this declaratory judgment action seeking an adjudication of its duties to defendants under a commercial liability insurance policy with regard to a number of related actions filed against defendants and others. Presently before the court is plaintiff's motion for summary judgment and defendants' motion for judgment on the pleadings (which the court has construed as a motion for summary judgment). The motions address only plaintiff's duty to defend. For the reasons set forth below, the motions will be granted in part and denied in part.

Federal Rule of Civil Procedure 56 (c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the

initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in Matsushita). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989). Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846 (3d Cir. 1992). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted. Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 113 S.Ct. 1262 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The duty to defend is separate and distinct from the duty to indemnify under Pennsylvania law. Erie Ins. Exchange v. Transamerica Ins. Co., 533 A.2d 1363, 1368 (Pa. 1987) ("the duty to defend is a distinct obligation, separate and apart from the insurer's duty to provide coverage."). An

2

insurer's obligation to defend is fixed solely by the allegations in the underlying complaint(s). <u>Etna Casualty and Surety Co., v. Roe</u>, 650 A.2d 94, 98 (Pa. Super. 1994); <u>Stidham v. Millvale Sportsman's Club</u>, 618 A.2d 945, 953-54 (Pa. Super. 1993). An insurer has a duty to defend whenever the allegations in a complaint against its insured, when taken as true and construed in favor of the insured, set forth a claim which potentially falls within the coverage provided by the policy. <u>Lucker Mfg. Inc., v. The Home Ins. Co.</u>, 23 F.3d 808, 821 (3d Cir. 1994); <u>Cadwallader v. New Amsterdam Casualty Co.</u>, 152 A.2d 484, 488 (Pa. 1959). The duty to defend is triggered even if the allegations against the insured are groundless, false or fraudulent. <u>D'Auria v. Zurich Ins. Co.</u>, 507 A.2d 857, 859 (Pa. Super. 1986). The duty likewise exists where the potential for a covered claim exists and the determination of coverage depends upon the existence or non-existence of undetermined or disputed facts raised against the insured. <u>Germantown Ins. Co., v. Martin</u>, 595 A.2d 1172, 1174 (Pa. Super. 1991). Where a complaint raises a claim potentially within the scope of coverage, the duty to defend remains with the insurer until the claim is narrowed to one patently outside the policy coverage. <u>Germantown Ins. Co.</u>, 595 A.2d at 1174 ("as long as the complaint comprehends an injury which may be within the scope of the policy, Germantown must defend Martin's estate until the claim is confined to a recovery the policy does not cover.") (citing <u>United Services Automobile Assoc. v. Elitzky</u>, 519 A.2d 982 (Pa. Super. 1986), <u>alloc. denied</u>, 528 A.2d 957 (Pa. 1987)); <u>Stidham</u>, 618 A.2d at 953-54.

"It is not the actual details of the injury, but the nature of the complaint which determines whether the insurer is required to defend." <u>Etna Casualty and Surety Co.</u>, 650 A.2d at 98 (<u>quoting</u> <u>D'Auria</u>, 507 A.2d at 859). The particular causes of action in the complaint also are "not determinative of whether coverage has been triggered.... Instead, it is necessary to look at the factual allegations contained in the complaint." <u>Mutual Benefit Ins. C. v. Haver</u>, 725 A.2d 743, 745 (Pa. 1999).

Moreover, the potential scope of coverage under an insurance policy must be examined before it can be determined whether a complaint is potentially covered by the policy. <u>Lucker</u>

3

Manufacturing, Inc., 23 F.3d at 813. The inquiry into coverage is antecedent to ascertaining whether the duty to defend exists. Id. (citing Erie Ins. Exchange v. Transamerica Ins. Co., 533 A.2d 1363, 1368 (Pa. 1987).

"Traditional principles of insurance policy interpretation control the inquiry into coverage." Lucker Manufacturing, Inc., 23 F.3d at 814. The instrument must be interpreted in light of the parties' reasonable expectations. Standard Venetian Blind Co., v. American Empire Ins., 469 A.2d 563 (Pa. 1983). If the language of an insurance policy is clear and unambiguous, it must be given its ordinary meaning. Imperial Cas. & Indm. Co., v. High Concrete Structures, Inc., 858 F.2d 128, 131 (3d Cir. 1988). If a provision of the policy is ambiguous, the ambiguity is to be construed to afford coverage. Lucker Manufacturing, Inc., 23 F.3d at 814. A provision is ambiguous if after considering it in the context of the entire policy reasonable minds could differ as to its meaning. Imperial Casualty and Indemnity Co., 858 F.2d at 131. However, strange or contrived readings of policy language are  not to be undertaken to create an ambiguity where none exists, nor should a court attempt to rewrite policy language in a manner that conflicts with the plain meaning of the words employed. Lucker Manufacturing, Inc., 23 F.3d at 814; Elitzky, 517 A.2d at 986.

Westfield issued a "commercial package" policy to Mark Campisi on September 27, 1999, and renewed the policy on September 27, 2000, and September 27, 2001 ("the policies"). The package provided business property and business liability coverage. The business liability section is the only portion at issue. Defendant Mark Campisi was identified as the named insured in each of the policies. Campisi was the sole owner of USA Financial Services, Inc., Banker's Financial Services, Inc., and Atlantic Credit, Inc., during the effective dates of the policies.

The business liability section contained insuring agreements providing for comprehensive general liability ("CGL") insurance based on post 1966 Insurance Services Organization standard-form policy language. Bodily injury and property damage liability coverage is provided as follows:

COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.      Insuring Agreement

4

        a.        We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.

        b.        This insurance applies to "bodily injury" and "property damage" only if:

            (1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory."

            (2)    The "bodily injury" or "property damage" occurs during the policy period.

Bodily injury is defined as follows:

        "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

Property damage is defined as follows:

        "Property damage" means:

        a.        Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that causes it; or

        b.        Loss of use of tangible property that is not physical injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

The policies also provide coverage for personal and advertising injury as follows:

COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY

    1.        Insuring Agreement

        a.        We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.

        b.        This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only

5

> if the offense was committed in the "coverage territory" during the policy period.

Personal and advertising injury are defined as follows:

> "Personal and advertising injury" means injury, including consequential "bodily injury" arising out of one or more of the following offenses:

> a.  False arrest, detention or imprisonment;

> b.  Malicious prosecution;

> c.  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

> d.  Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

> e.  Oral or written publication of material that violates a person's right of privacy;

> f.  The use of another's advertising idea in your "advertisement"; or

> g.  Infringing upon another's copyright, trade dress or slogan in your "advertisement".

The term "advertisement" is defined as follows:

> "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.

Westfield seeks a declaration with regard to three different types of litigation commenced against defendants and others. In the first of these the Attorney General of the Commonwealth of Pennsylvania filed an action in the Commonwealth Court of Pennsylvania (" the AG's action") against defendants and others seeking injunctive relief prohibiting a group of home improvement/home remodeling contractors and entities/individuals providing mortgage broker, secondary mortgage broker and mortgage lending services in conjunction with those contractors from continuing with various methods, acts, and practices assertedly employed between 1995 and 2001. A second amended complaint was filed in the AG's action in July of 2002. The bulk of the

6

consumer transactions referenced in the second amended complaint occurred between the beginning of 1997 and the end of 2000. The Attorney General ("AG") alleged that the various business practices identified in the complaint violated Pennsylvania's (1) Consumer Protection Law, (2) Home Improvement Finance Act, (3) Mortgage Loan Act, and (4) Credit Services Act.

Specifically, the AG alleged that a group of individuals/entities known as the Iron City Builders provided home improvement and remodeling services throughout Western Pennsylvania and as part of this process offered assistance in procuring financing for the home improvement and remodeling services being offered. The Iron City Builders solicited customers to obtain the necessary financing through a series of representations and promises that were false or misleading. These included statements concerning the quality and timing of the services rendered. The AG further alleged that the Iron City Builders did not perform the home improvement services in a timely or workmanlike manner, as represented, altered customer signatures and other material information in various documents, created false or inaccurate notarizations of signatures and obtained completion of work certificates for the improvements through coercion and misrepresentation, including threatening to cease work unless the consumer executed the completion certificate prior to the work being finished. In many instances the consumer did not receive the products or services as promised or received shoddy and unworkmanlike installation of improvements.

Defendants were named in the AG's action in conjunction with their mortgage brokerage and lending services that were provided as part of the package offered to consumers in conjunction with the Iron City Builder's proposed home improvement and remodeling services. Defendants USA Financial and Banker's Financial earned a broker's commission for each loan procured for consumers referred by the Iron City Builders. The commission was based upon a percentage of the principal of the resulting loan. Defendants allegedly entered into a joint venture or common enterprise with the Iron City Builders and as part of the joint venture engaged in several deceptive or misleading practices. These included: altering consumer loan and credit applications to misstate consumer income and debt-to-asset levels; representing to the consumer that periodic or monthly

7

repayment terms would be "affordable" when in fact repayment terms were significantly higher or more expensive than the terms that were represented during the negotiation process leading to the loan; charging additional "fees" for services performed by the defendant entities as if each entity were separate and unrelated; charging unauthorized, unnecessary and excessive fees without adequately disclosing the nature and grounds for the fees, at times without the prior knowledge or agreement of the consumer; diverting a portion of the distribution of funds to defendant Atlantic Credit as part of the closing costs when the disbursement of such proceeds did not further the legitimate needs of the consumer in conjunction with securing the financing - through methods that deprived the consumer of knowingly agreeing to or authorizing such a distribution; obtaining financing for consumers when the employees and agents of defendants knew or had reason to know that the consumers did not possess sufficient income and assets to qualify for the principal amount of the loans; and creating notarization of consumer signatures on various legal documents when the consumer did not actually sign the document in the presence of a notary. As a direct and proximate result of the procurement of loans that were unsuitable for the particular consumer and the USA defendants' failure to seek financing appropriate to the consumer's financial means and household needs, the AG alleged that "many involved consumers have defaulted, or are in jeopardy of defaulting, on the loans brokered for them by USA Financial or Bankers' Financial d/b/a USA Home Loans." AG's Second Amended Complaint at ¶ 97.

The AG further alleged that as part of the joint venture the USA defendants employed appraisers to value the residential properties in order to obtain the loans. These appraisers included Reid Baker doing business as Baker & Associates. Baker & Associates prepared inaccurate appraisal reports and in the process allegedly failed to inspect the property in question, failed to take into account the original purchase price of the property, used inappropriate properties for the purpose of arriving at a "comparable" appraisal, failed to take into account the particular real estate market in question and failed to confirm the condition, quality and age of the house being appraised. As a result, false, misleading and inflated appraisals were produced, which in turn permitted consumers

to utilize the lending services of USA Financial or Bankers' Financial and obtain home improvement or remodeling services which the consumers would not have otherwise been qualified to obtain.

USA Financial Services and Bankers Financial Services were named in counts alleging a violation of the Home Improvement Finance Act, 73 P. S. § 500-101, the Consumer Protection Law, 73 P. S. § 201-1, the Secondary Mortgage Loan Act, 7 P. S. § 6601, and the Credit Services Act, 73 P. S. § 2181.   In addition, all defendants named in the AG's complaint, including the USA defendants, were alleged to have engaged in a civil conspiracy to violate the Consumer Protection Law and the Credit Services Act.

Based on the above, the Attorney General sought (1) an order from the Commonwealth Court permanently enjoining all identified defendants from engaging in any conduct in violation of the Consumer Protection Law, the Home Improvement Finance Act, the Secondary Mortgage Loan Act or the Credit Services Act and (2) a declaration rendering null and void all contracts between defendants and the consumers who had been damaged by the alleged course of conduct and directing the named defendants to make restitution to all consumers identified in the complaint and others who had been harmed by their course of conduct.  In addition, the AG requested civil penalties in the amount of $1,000 for each violation of the Consumer Protection Law and $3,000 for each violation involving a consumer 60 years of age or older, forfeiture of any right or privilege to conduct business in the home improvement, loan brokering or appraisal industries in the Commonwealth of Pennsylvania, and the costs of investigation and attorneys fees.

Westfield also seeks a determination of its duties with regard to Neptune Issue, Inc. v. USA Financial Services, Inc., et al., which was assigned to this member of the court at Civil Action No. 02-1358. The complaint set forth causes of action for breach of contract, breach of contract as a third party beneficiary, negligent misrepresentation, professional negligence, respondeat superior liability and agency. Neptune, Issue, Inc., through its predecessor-in-interest, Parkway Mortgage Company, Inc., underwrote twenty-four mortgage loans for real property located in Southwestern Pennsylvania. The loans were issued between April and November of 1998. Defendant USA Financial Services

9

acted as a local agent/mortgage broker for Parkway and hired the Bakers to produce appraisals for each of the properties. The appraisals purported to establish a fair market value for a home equity loan. The appraisals were used to establish a loan-to-value ratio and the loan approval amount for each applicant/mortgagee. Parkway allegedly relied on the appraisals in approving each loan.

The home equity loans underwritten by Parkway were subsequently sold to a third party known as Summit Bank Corporation. After becoming aware of some potential irregularity, Summit allegedly conducted a due diligence investigation which uncovered information indicating the appraisals were questionable. Summit ordered new appraisals on each loan and discovered that the "comparable properties" used in the appraisals were often located in distant areas and did not contain comparable attributes. Summit commenced an arbitration proceeding against Parkway and as a result Parkway was forced to repurchase each of the loans at a substantial loss. Neptune, as a successor-in-interest and purported assignee, sought to recover for the substantial financial losses occurring from Parkway's repurchase of each mortgage from Summit.

At count one Neptune pursued a theory that USA Financial breached its agreement with Parkway and caused it, and in turn Neptune, to suffer financial losses and expenses. Count two alleged that Neptune was a third-party beneficiary of the contract between USA Financial and the Baker defendants. Count three asserted a claim for negligence misrepresentation against the Baker defendants on the ground that they had a duty to exercise reasonable care in providing USA Financial, and ultimately Neptune, with truthful and accurate information about the properties securing the loans. The Baker defendants were sued at count four for breach of professional negligence based on the premise that the appraisals fell outside the accepted professional or occupational standards normally maintained by similarly-licensed appraisers. Finally, Neptune alleged that the Baker defendants were employed by USA Financial or another entity and as a result of the Baker defendants' negligence USA Financial was liable to Neptune under a theory of respondeat superior. Alternatively, Neptune maintained the Baker defendants were agents of USA Financial and subject to its control. Based on these allegations and the general theories of recovery

10

outlined above, Neptune sought money damages for the financial losses Parkway incurred in having to repurchase the twenty-four mortgages from Summit Bank, plus interest, costs, attorneys fees, and punitive damages.

The Neptune action was initially filed in the District of New Jersey and thereafter transferred to this court on August 2, 2002. A case management conference was held on November 25, 2002, at which time a stay was requested in light of the AG's action. Pursuant to this request, no action was taken by this court until July of 2003 when it became clear that the AG was no longer actively investigating the matters underlying the AG's complaint and thus the need for a stay was no longer necessary. Thereafter, various orders were entered and conferences were held in an effort to move the Neptune action to final resolution. After voluntarily dismissing the claims brought against Mark R. Campisi individually and as the former president/chief executive officer of USA Financial Services, Neptune settled the action with the remaining defendants and the case was closed pursuant to a Federal Rule of Civil Procedure 41(a) (1) stipulation of dismissal.

Finally, Westfield seeks a determination of its duties with regard to three separate individual homeowners' actions, one of which involved five separate mortgages. The first of these was commenced in the Court of Common Pleas of Butler County by Clair and Betty Oakes against USA Financial and others through the filing of a writ of summons. No complaint has ever been filed.

The second was commenced in the Court of Common Pleas of Venango County by Mark and Laurie Lee Vegan against USA Financial Services, Reid Baker and Iron City Builders. The complaint alleged that Iron City Builders solicited customers for home improvement work and the homeowners expressed concern about their ability to afford the costs of the proposed improvement/remodeling services being offered. As part of the negotiations Iron City Builders assured each homeowner that affordable financing could be arranged through USA Financial Services. As part of the loan application process, USA Financial Services employed Baker & Associates to conduct appraisals on each residence, which in turn established inflated values. The inflated values were then used by USA Financial to obtain loan approval in amounts that would not

have been otherwise approved and the proceeds were used to pay brokers fees to USA Financial and appraisal fees to Baker.

Specifically, the Vegans alleged they obtained a second home mortgage to finance a siding job and the process leading to the loan violated the Pennsylvania Credit Services Act in a number of aspects. For example, they assertedly were not given an adequate opportunity to review the loan documents and were advised that USA Financial was acting in the Vegans' best interest, when in fact the agents of USA Financial knew or should have known that the Vegans would be unable to afford the monthly loan payments. The Vegans relied on false statements made by USA Financial and incurred late fees of $1,234.38 due to their inability to make timely payments. The Vegans further averred that USA Financial fraudulently represented that a portion of the loans would be placed in escrow for property taxes and such taxes would be paid in a timely manner, when in fact the property taxes for 1999 and 2000 went unpaid, resulting in penalty and interest charges of $412.58. In addition, they asserted USA Financial failed to advise them of the detrimental effect of refinancing a 10.5 percent loan through an 11.5 percent loan, and of consolidating unsecured debt into a mortgage loan. In addition, USA Financial failed to advise the Vegans about the true nature of the closing costs, including the increased costs associated with consolidating unsecured debt into a mortgage. It also failed to disclosure the significant brokers fee being payed to USA Financial as well as the additional fees being paid to Parkway. Based on this conduct the Vegans sought a determination that defendants' actions violated various sections of Pennsylvania's Credit Services Act and Unfair Trade Practices Act, entitling them to treble damages, counsel fees and costs.

Count two of the complaint is addressed solely against the Baker appraisers. Counts three and four are addressed solely against Iron City Builders. Specifically, Count Three alleged the value of the work performed by Iron City Builders was far less than the amount billed by them, thereby resulting in unjust enrichment. Count Four alleged that Iron City Builders acted as a loan broker and solicited individual homeowners on behalf of USA Financial. In the process Iron City Builders allegedly made false representations regarding the loan process, resulting in violations of

12

Pennsylvania's Credit Services Act and Unfair Trade Practices Act. Finally, the Vegans alleged a claim of conspiracy against all defendants, asserting each had conspired to induce them to borrow excessive amounts of money against their home, knowing that they would be unable to afford the resulting loan payments. They essentially relied on numerous false and fraudulent statements made by the defendants during the course of the conspiracy, and as a result averred they were entitled to money damages, counsel fees, punitive damages and costs.

A multi-plaintiff complaint also was filed against USA Financial Services by four separate mortgagors: Fay and Phillip Miller; Margaret Ward and Patricia Young; George Fry; and Clair Sibble. The allegations of the complaint allege that each homeowner was contacted by Iron City Builders and after further solicitation remodeling work was proposed. The homeowners had only minimal equity in their property and expressed concern about being able to afford the proposed remodeling and/or the mortgage being proposed to pay for the work. Representatives for USA Financial assured the loan applicants that they would be able to obtain a mortgage which would permit them to borrow the funds to pay for the improvements under arrangements that would result in affordable monthly payments. The loan applications reflected household income and appraisal values that were inflated. Representations were made concerning the amount of monthly payments or the ability to obtain subsequent financing which proved to be untrue. Similarly, some applicants were told that real estate taxes would be paid from the proceeds of the loan, when in fact they were not.

The Millers assert they specifically advised a USA Financial representative that they had an existing mortgage with an interest rate of 11.2% and were primarily interested in obtaining a loan to finance the home improvement being offered by Iron City Buildings. They provided accurate information regarding their household income and debts. They did not receive a copy of the loan application they completed and signed and were unaware of the amount of money to be borrowed. The application itself contained a monthly income amount which was in excess of the amount they reported, and therefore the Millers aver that the USA Financial representative must have inflated that

13

figure without their knowledge or approval. When the Millers appeared for the closing, the loan was for an amount that had not been previously disclosed. The Millers advised that they could not afford the monthly payment on the loan due to other loans and credit card debts. After consultation, the Millers were assured by the USA Financial representative that a second loan would be approved, that the monthly payment on that loan would not exceed $160 and they could use the proceeds from the second loan to pay off any additional loans or bills not being consolidated through the first loan. The Millers also were assured that their 1999 real estate taxes would be paid from the proceeds of the first loan. The Millers assert they were not given an adequate opportunity to review the documents before they were presented for signature, so they signed the documents in reliance on the assurances and representations of the USA Financial representative.

The Millers specifically aver that prior to closing USA Financial knew, or should have known, that they would be unable to afford the monthly payments on the arranged mortgage. They had approximately $15,000 in equity in their home at the time. During closing, the USA Financial representative  allegedly failed to advise that payment would increase from $352.29 to $728.94, failed to disclose the detrimental effects of refinancing a loan with an interest rate of 11.2% to an interest rate of 12.95%, failed to advise of the detrimental effect of consolidating unsecured debt into a mortgage loan, failed to advise that incorporating unsecured debt increased closing costs and USA Financial's fees were calculated on a percentage of the total loan and failed to advise of all the various closing costs which would result from signing the loan documents. Throughout the process the USA Financial assertedly failed to comply with its duty of loyalty to the Millers and to act in good faith in advancing their interests.

Subsequently, the Millers were unable to obtain a second loan as represented by USA Financial. The 1999 real estate taxes were not paid out of the loan proceeds.  Consequently, the Millers were unable to make monthly loan payments, a mortgage foreclosure complaint was filed against them, a judgment was entered in the amount of $72,388.31 and their home was sold at sheriff's sale on July 24, 2001. Based on asserted violations of the Pennsylvania's Credit Services

14

Act and Unfair Trade Practices and Consumer Law, the Millers sought treble damages plus attorneys fees and costs and an award of punitive damages.

Margaret Ward and Patricia Young made substantially similar allegations against USA Financial. After entering into a contract with Iron City Builders, Ward and Young were assured they could consolidate existing debt and borrow sufficient funds to pay for the improvements at an affordable monthly amount. They provided accurate information regarding household income and debts. They further advised the USA Financial representative that: Ward was disabled and could not afford a large monthly payment; their existing mortgage was subsidized through the Federal Homeowners Association and they were primarily interested in obtaining a loan to finance the improvements; and their existing loan had a monthly payment of $159, and they could not afford more than $300 per month. A USA Financial representative indicated they could consolidate their existing debt and borrow the funds to pay for the improvements through a mortgage that would result in a monthly payment of less than $300 per month. They did not receive a copy of the loan application which they signed and were unaware of the total amount of the loan requested in the application. At closing, Ward and Young received numerous legal documents that were not explained to them, they were not given an adequate opportunity to review the documents prior to signing them and they signed the documents based upon the prior representations of the USA Financial representative. Only after closing did Ward and Young realize that the monthly payment on the new loan was $577.20 and after discovering the same they were advised by the USA Financial representative that it was too late to rescind the transaction.

Ward and Young aver that USA Financial knew, or should have known, that they would be unable to afford the monthly payment on the loan USA Financial arranged. The USA Financial representative allegedly failed to inform them of the substantial increase in monthly payment, the detrimental effect of refinancing an FHA subsidized loan with a loan that contained an interest rate of 11.3%, the detrimental effect of consolidating unsecured debt into a mortgage, the detrimental effect of paying off unsecured debt on their closing costs and all of the closing costs that they would

15

incur. In doing so USA Financial assertedly failed to act in accordance with its duty of loyalty to Ward and Young and failed to act in good faith to advance their interests. USA Financial made false, misleading and fraudulent statements to Ward and Young with the intent to induce them to act and Ward and Young did so in justifiable reliance on those statements.

After entering into the financing arranged by USA Financial, Ward and Young were unable to make monthly payments. A mortgage foreclosure complaint was filed against them on August 20, 1999, and a default judgment was entered on October 14, 1999, in the amount of $66,952.93. Their real estate was sold at sheriffs sale on January 11, 2000. Based on violations of Pennsylvania's Credit Services Act and Unfair Trade Practices and Consumer Protection Law, Ward and Young seek treble damages, costs and attorneys fees, and an award of punitive damages.

The allegations against USA Financial Services by George Fry are substantially similar to those of Ward and Young. After engaging in the same pattern of conduct with regard to the loan application, Fry arrived for closing and learned that he was actually borrowing $63,000. He advised the USA Financial representative that he could not afford the monthly payment because of obligations on other loans and credit cards. Fry had been advised by the USA Financial representative that his monthly payment under the new loan would be $501.00 and all of his existing debts would be paid off so he would be able to afford the monthly payment. Fry was not advised of the detrimental effect of consolidating unsecured debt into a mortgage loan or of the increased closing costs resulting therefrom. USA Financial breached its duty of loyalty and failed to act in good faith in the furtherance and advancement of Fry's interests. Fry's debts were not paid off at closing and his monthly payment under the new loan was $564.00. Subsequently, Fry was unable to make monthly loan payments. A mortgage foreclosure complaint was filed against him on July 20, 2000, and a judgment in the amount of $70,039.49 was entered on March 1, 2000. Based on alleged violations of the same statutes, Fry seeks treble damages, attorneys fees and costs, and an award of punitive damages.

16

The allegations by Clair Sibble likewise raise the same pattern of conduct. Sibble was purchasing his home under an article of sale agreement that did not require him to pay interest on the purchase price. After being advised that a loan had been secured on his behalf in the amount of $60,000, Sibble was advised that an appraisal had established the value of his property at $89,000. Sibble was not given an adequate opportunity to review the documents at closing, but signed the same based on assurances and representations from the USA Financial representative indicating the loan was appropriate for him and included an affordable monthly payment. The USA Financial agent failed to advise Sibble of the detrimental effect of refinancing an interest free loan with a loan that contained a interest rate of 10 percent and the detrimental effect of consolidating unsecured debt into a secured mortgage and the increased closing costs that would result therefrom. During the loan application and closing process, USA Financial breached its duty of loyalty to Sibble and failed to act in good faith. As a result, Sibble was unable to make monthly payments. A mortgage foreclosure complaint was filed against him on March 1, 2000, and was in the process of being reduced to judgment at the time the complaint was filed. Sibble sought the same damages sought by his co-plaintiffs.

Westfield contends that the underlying complaints do not comprehend a form of injury or damage for which coverage is afforded. In addition, it maintains that the "expected or intended" injury exclusion in the policies and/or the public policy of Pennsylvania bar(s) coverage for the underlying claims. Finally, plaintiff asserts that coverage is not available to Mark Campisi or USA Financial for any homeowner claims based upon contracts entered prior to January 1, 1999, because neither was an "insured" prior to that date.

Defendants maintain  the allegations of the underlying complaints raise claims that potentially come within the scope of injury or damages covered by the policies. They argue the claims reflect "property damage" or "loss of use" of tangible property. They further contend the coverage provided under "personal or advertising injury" is broad enough to encompass various scenarios which may ultimately occur during the course of litigating the underlying claims in the

17

complaints. In addition, the underlying complaints assertedly fail to provide a sufficient basis to rely on the "expected or intended" exclusion and the injuries of the underlying homeowners became manifest after January 1, 1999, thereby making Campisi and USA Financial insureds at all relevant times. We consider the parties' respective positions with regard to each separate complaint.

The AG's complaint does not seek recovery of a form of damages or injury covered by the policies. The AG's complaint seeks declaratory and injunctive relief precluding the defendants from continuing to conduct business in a manner that violates various consumer and lending laws of Pennsylvania. Based on such violations the AG sought a declaration that all contracts between defendants and consumers were null and void, civil penalties for each violation, and forfeiture of the defendants' right or privilege to conduct business in the lending industry. Beyond these forms of equitable and declaratory relief, the AG sought an order directing defendants to (1) make "restitution" to all consumers identified in the complaint as well as others who had been harmed by any conduct found to be in violation of the consumer protection laws and (2) pay the costs of investigation and attorneys fees incurred in preparing and prosecuting the action.

It is well-settled that a suit by a state attorney general seeking to protect the public from business practices prohibited by statute through injunctive and declaratory relief does not allege damages falling within the scope of coverage afforded by a CGL policy. In Seaboard Surety Co., v. Ralph Williams' Northwest Chrysler Plymouth, Inc., 504 P.2d 1139 (Wash. 1973), the Supreme Court of Washington held that a suit for injunctive and declaratory relief by Washington's state attorney general based upon unfair methods of competition and unfair and deceptive acts and practices did not present a claim for damages based upon one of the various causes of action enumerated in a standard CGL policy. Id. at 1143. This is so notwithstanding any request for relief in the form of restitution, because such relief "is only incidental to and in aid of the relief asked on behalf of the public." Id.

The Supreme Court of California likewise has opined that "insurable damages do not include

18

costs incurred in disgorging money that has been wrongfully acquired" in holding that claims for unfair business practices and violation of the federal Truth-in-Lending Act did not trigger an insurer's duty to defend under standard CGL policies. Bank of the West v. Superior Court of Contra County, 833 P.2d 545, 553-54 (Cal. 1992). In considering whether "the CGL policy's standard language covers claims under the state statute prohibiting unfair business practices [the court observed that] the authority against coverage for such claims is overwhelming." Id. at 543 (collecting cases). The court further observed that a clear distinction exists between a claim demanding that a defendant return something that he or she wrongfully acquired or received and a claim where a defendant is asked to compensate the plaintiff for an injury suffered as a result of the defendant's wrongful conduct. Id. at 547. Such disgorgement or restitution simply fails to present a claim seeking "damages" within the meaning of an insurance policy. Id. at 547-48. The Supreme Court of Alaska and the Court of Appeals for Ohio have reached the same conclusion. See O'Neill Investigations v. Ill. Emp. Ins., et. al, 636 T.2d 1170, 1173-77 (Alaska 1980) (claim under state's unfair trade practices and consumer protection act for restoration of money acquired from consumers through unfair collection practices did not seek "damages" covered by a professional liability insurance policy); Heritage Mutual Ins. Co. v. Ricart Ford, Inc., 663 N.E.2d 1009, 1012 (Ohio Ct. App. 1995) (suit by state attorney general seeking declaratory judgment and injunctive relief for violations of Ohio Consumer Sales Practices Act based on harm to consumers and public in general did not seek form of damages within coverage provided by standard CGL policy). Pennsylvania law is in accord with these general principles. See Central Dauphin School v. American Cas. Co., 426 A.2d 94, 95-97 (Pa. 1981) (claim by taxpayers for return of unlawfully collected taxes did not present loss or form of damages covered by a school district's liability insurance policy); USX Corp., v. Adriatic Ins. Co., 99 F. Supp.2d 593, 620 n. 19 (W.D. Pa. 2000) (causes of action seeking disgorgement of ill-gotten gain from those who have violated the law are beyond an insured's reasonable expectation of the purposes of insurance and the meaning of the term "damages" as used in a CGL policy).

19

The AG's action does not seek a compensation award for injuries to persons or property as a measure of restoration. As reflected in the AG's Amended Complaint, relief by the AG is limited to "restor[ing] to any person in interest any moneys or property which may have been acquired by any violations of [Pennsylvania's Consumer Protection Law]." AG's Amended Complaint at ¶ 218 (citing 73 P.S. § 201-4.1). In other words, the form of restoration sought by the AG is disgorgement of money obtained from the loan transactions. See Northview Motors, Inc., v. Commonwealth of PA, 562 A.2d 977, 980 (Pa. Commonw. 1989) (upholding trial court's damage award of gain defendant obtained through violation of Consumer Protection Act). Consequently, the claims advanced in the AG's action do not seek a form of covered "damages" or "injury" within the meaning of the policies and therefore plaintiff has no duty to defend or indemnify its insureds against the claims for relief in the AG's action.

The injury and damages asserted in the Neptune action also are outside the coverage provided by the policies. There, an assignee sought to recover losses resulting from the sale of mortgages generated by defendants' business activities. After the mortgages were sold by a lender that approved 24 loans that were brokered by USA Financial, the purchaser assertedly discovered that the appraisal values assigned to each property were created in a negligent and inaccurate manner, giving rise to claims for breach of contract, breach of contract as a third party beneficiary , negligent misrepresentation, professional negligence and so forth. Neptune's losses resulted from an arbitration award which required the seller to repurchase each of the loans at a substantial loss. The right to collect for that loss purportedly was subsequently assigned to Neptune.

The cases are legion for the proposition that purely economic loss in the form of lost profits or diminution in value of intangible property is beyond the scope of coverage provided by a standard CGL policy. See e.g. Old Republic Ins. Co., v. West Flagler Assocs., Ltd., 419 So.2d 1174, 1177 (Fla. Ct. App. 1982) ( injury to investment and loss of anticipated profits are not tangible property or other forms of covered injury/damages); City of Burlington v. Association of Gas & Electric Ins. Services, Ltd., 751 A.2d 284, 291 (Vt. 2000) ("the vast majority of courts have held that purely

economic losses, such as lost profits, are generally not recoverable under insurance provisions providing coverage [in a standard CGL policy].") (collecting cases in support). This includes the loss of business opportunities or lost income from the investment in real property. See General Ins. Co. of America v. Western Am. Den. Co., 603 P.2d 1245, 1247 (Or. Ct. App. 1979) (standard CGL policy did not provide coverage for lost investment opportunity from the purchase of real property encumbered by undisclosed easements).

Pennsylvania law also recognizes that purely economic losses such as lost profits or diminution in value of intangible property are not themselves a form of injury or damage within the grant of coverage provided by a standard CGL policy. It is well-settled under Pennsylvania law that in order to fall within the scope of "property damage" as used in a CGL policy, there must be some injury or damage to "tangible property." Lucker Manufacturing, Inc., 23 F.3d at 818-20. In other words, property damage within the meaning of a CGL policy does not cover intangible property such as stocks or investments, intangible rights such as goodwill or reputation, or economic interests such as overhead, profits, investment value or productivity. Id. at 819 (collecting cases in support).

The policies in question draw a clear distinction between economic losses such as loss of profit and "property damage." Coverage is provided only for the later. Property damage is defined as "physical injury to tangible property, including all resulting loss of use of that property." It likewise includes "loss of use of tangible property that is not physically injured." But in both events the loss of use must be from the loss of "tangible property."

The claims in Neptune did not seek damages for injury to or loss of use of tangible property. "Under Pennsylvania [law], tangible property is property that can be felt or touched, or property that is capable of being possessed or realized." Lucker Manufacturing, Inc., 23 F.3d at 818. The term "tangible" refers to things that are physical and capable of being objectively perceived. United States Fidelity & Guar. Co., v. Barron Indus., Inc., 809 F. Supp. 355, 360 (M.D. Pa. 1992). Lost profits, injury to business goodwill, and similar forms of economic losses do not constitute a form of damage or injury to tangible property. USX Corp., 99 F. Supp.2d at 617 ("the Insuring Agreement does not

21

provide coverage where there is no property damage to or actual loss of use of tangible property."). Because the claims in Neptune sought recovery only for lost investment opportunities, lost profits and similar forms of economic losses, plaintiff owed no duty to defend defendants in the Neptune action.

The individual homeowners' actions stand on different footing. In contrast to the AG's and Neptune Issue's actions, the complaint commenced by Fay and Phillip Miller, Margaret Ward, Patricia Young, George Fry and Clair Sibble seeks redress for mortgage foreclosure on each homeowner's residence. Fay and Phillip Miller and Margaret Ward and Patricia Young had default judgments taken against them and their property was sold at sheriff's sale prior to the filing of the complaint. A fair reading of the allegations as they pertain to George Fry and Clair Sibble indicate that foreclosures followed by sheriff's sales were in process at the time the complaint was filed. The complaint by Mark and Laurie Vogan also clearly raised the potential of mortgage foreclosure because they had been "unable to make some of the monthly loan payments and [had] incurred late charges to date in the amount of $1,234.38," thereby signifying a real potential for further adverse action in the form of foreclosure being taken against them.

As previously noted, the policies provide coverage for "loss of use of tangible property that is not physically injured." At least a portion of the damages sought by the individual homeowners fall within this definition of covered damages. The averments of the homeowners' complaints and the basic principles of insurance law regarding property damage support this assessment.

First, it cannot be disputed that an individual's home is property capable of being possessed or realized. As such, it is "tangible property" within the meaning of that term in a standard CGL policy. See Lucker Manufacturing, Inc., 23 F.3d at 818-19; U.P.S. Fidelity & Guar. Co., 809 F. Supp. 360 (use of the qualifying term "tangible" denotes property that is physical and capable of being touched and perceived).

Second, the homeowners' complaints specifically allege or potentially comprehend a loss of use of their tangible property as an end result of the foreclosure process. The lost ability to use

22

tangible property for its actual or contemplated purpose "is a 'loss of use' within the meaning of the standard CGL policy." Lucker Manufacturing, Inc., 23 F.3d at 816-17.

Finally, the policies do not require physical injury to the tangible property in order to establish loss of use. The mere loss of use of tangible property is enough. Damages for the loss of use of the homeowners' residences is clearly raised by the nature of the claims advanced against defendants. Accordingly, the individual homeowners' complaints aver or potentially comprehend a form of damage that falls withing the meaning of the policies.

Westfield's attempt to rely on the line of cases distinguishing between a "loss of use" of property and a "loss of property" is unavailing. See e.g. Collin v. American Empire Ins. Co., 26 Ca. Rptr. 2d 391(Cal. App. 4th 1994) ("'loss of use' of property is different from 'loss' of property."); Nortex Oil & Gas Corp., v. Harbor Ins. Co., 456 S.W.2d 489, 493 (Tex. App. 1970) ("there is a material difference between 'property taken' and 'property damage.'"). This line of authority stands for the unremarkable proposition that claims against an insured for conversion or theft of property do not arise from an "accident" or fortuitous event and thus fail to satisfy the definition of an "occurrence" under a standard CGL policy. Furthermore, a significant number of these cases involved the interpretation  of standard liability policies written largely in compliance with the insurance industry's 1966 CGL form, and did not contain the 1973 industry change incorporating coverage for the "loss of use" concept currently before this court. See General Ins. Co. of America v. Palmetto Bank, 233 S.E. 2d 699, 702 (S.C. 1977) ("General's policy was a standard liability policy, written largely in compliance with standards adopted by the insurance industry in 1966 (see generally Keeton, Insurance Law §§ 2.10 2.11 1971). In 1973, the industry changed the standard definition of 'property damage' to include loss of use as a recognized 'injury' to property; that definition is not, of course, before us, the policy of General having been issued to Home Wholesale in 1971.")). And while Westfield accurately notes that the measure of damages for loss of use is distinct from that for permanent deprivation of property, such matters properly are considered for the purposes of determining the amount of actual indemnification. At this juncture, the individual

homeowners may be able to establish a wrongful loss of use of their residence as measured by the fair market rental value of their homes between the loss of use of thereof and their restoration from defendants' wrongful conduct. At the very least, it cannot be said that recovery for such damages is not within the contemplation of the homeowners' requests for relief. Compare First Newton National Bank v. General Cas. Co. of Wisconsin, 426 N.W.2d 618, 626 (Iowa 1988) (claims for loss of real and personal property based on foreclosure on family farm held sufficient to "meet the definition of property damage in both [CGL] policies.").

Under the policies a loss of use of property not physically injured is deemed " to occur at the time of the 'occurrence' that caused it." As previously noted, an "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

Westfield argues that the homeowners' complaints are not premised on an "occurrence" as defined in the policies and reasons that under Pennsylvania Law, an intentional act cannot be an "accident," which by necessity is an unexpected and unplanned event. It posits that the homeowners' claims of fraud, non-disclosure, breach of the duty of good faith and fair dealing, and conspiracy contain only allegations of intentional and malicious conduct, which cannot be construed as "accidental."

Defendants maintain they have not been held liable for any intentional, willful or malicious conduct in any of the underlying actions and at least part of the underlying claims involve allegations concerning the use of inaccurate appraisals and similar contributing conduct by other defendants. They further observe that Westfield has failed to demonstrate any defendant engaged in the conduct in question with a subjective awareness that an injury substantially similar to the covered harm would result. Consequently, defendants maintain that at least part of the alleged harms were the result of an "occurrence" and Westfield's reliance on the expected or intended injury exclusion and violations of public policy are premature and fail to negate the duty to defend. We agree.

An accidental event or happening involving an element of fortuity is essential to establishing

24

an occurrence under Pennsylvania Law. Gene's Restaurant, Inc., v. Nationwide Ins. Co., 548 A.2d 246, 247 (Pa. 1988). Ascertaining whether such an event or happening occurred is centered on the causes of the resulting injury. D'Auria, 507 A.2d at 860-61 ("the general rule is that an occurrence is determined by the causes of the resulting injury."). "Thus, there must be an accident or fortuitous event which causes a covered loss." USX Corp., 99 F. Supp.2d at 628. A requirement of fortuity embraces the bedrock principle of Pennsylvania public policy "not to enforce an insurance coverage contract providing coverage for a non-fortuitous loss." Koppers Co., Inc. v. Etna Cas. & Sur. Co., 98 F.3d 1440, 1447 (3d Cir. 1996).

The insured bears the burden of advancing a prima facia showing that a loss is fortuitous. Id. Once such a showing is made, the insurer bears the burden of demonstrating that the loss falls outside the grant of coverage or otherwise is barred by public policy considerations. Id.

In considering whether policy provisions fail to reach or preclude coverage for intentional acts, the Supreme Court of Pennsylvania has drawn a "distinction between intending an act and intending a result." Eisenman v. Hornberger, 264 A.2d 673, 674 (Pa. 1970). Such limitations are to be construed as focusing on the damage or harm intentionally caused by the insured as opposed to the mere performance of an intentional act. Id. Thus, "before the insurer may validly disclaim liability, it must be shown that the insured intended by his act to produce the damage which did in fact occur." Id.

Pennsylvania courts follow the teachings of Elitzky in assessing whether coverage is barred as a result of an intentional act. Wiley v. State Farm Fire & Cas. Co., 995 F.2d 457, 460 (3d Cir. 1993). Elitzky held that a clause excluding coverage for damages intended or expected by the insured "is ambiguous as a matter of law and must be construed against the insurer." Elitzky, 517 A.2d at 989. Coverage is excluded where the insured intended to cause the same type of general injury or damage that resulted from the insured's conduct and an "insured intends an injury if he desired to cause the consequences of his act or if he acted knowing that such consequences were substantially certain to result." Id.; Etna Cas. & Sur. Co., 650 A.2d at 100 ("an insured intends an

injury if he/she desires to cause the consequences of his/her act or if he/she acted knowing that such consequences were substantially certain to result.") (quoting Stidham, 618 A.2d at 953)).  In other words, under Pennsylvania law "it is not sufficient that the insured intended his actions; rather, for the resulting injury to be excluded from coverage, the insured must have specifically intended to cause the harm." Id. (citing in support Eisenman, 264 A.2d at 674-75).  To be "expected" also denotes "an element of conscious awareness on the part of the insured" and therefore the concepts of "intended" and "expected" are synonymous for the purposes of insurance exclusionary clauses. Elitzky, 517 A.2d at 990.  "And, for the purposes of enforcing such clauses, Pennsylvania's public policy is coterminous with the force and effect of the exclusionary clause." USX Corp., 99 F. Supp.2d. at 630.  Thus, Pennsylvania courts apply a subjective standard in ascertaining whether an insured intended to cause damage or injury of the same general type leading to the imposed liability. Id.

The assessment of whether a happening was fortuitous or expected and intended is evaluated from the stand point of the insured.  USX Corp., 99 F. Supp.2d at 630 (citing Nationwide Mut. Fire Ins. Co., v. Pipher, 140 F.3d 222, 227 (3d Cir. 1998)).  "Although the subjective standard imposes a heavy burden on the insurer, consideration of the nature of the third-party's injury is essential and certain intentional torts such as assault and battery demonstrate an intent to produce a general type of harm which is controlling in the particular case." Id. (citing Gene's Restaurant, 548 A.2d 247 (malicious, willful assault and beating can never be an accident)).  An intent to harm may also be presumed where the insured is held liable under a cause of action that implies an intent to harm, but only where potential liability for reckless or negligent conduct under the same cause of action against the insured has been eliminated. Elitzky, 517 A.2d at 889.  However, simply because certain aspects of the insured's conduct may be construed as reflecting an intent to harm or may even constitute intentional criminal conduct does not preclude the potential for coverage where the factual allegations of the complaint also raise the potential of a covered injury or damage based on an accident or fortuitous chain of events brought about by the insured. See Erie Ins. Exchange v. Muff,

26

851A.2d 919, 929-32 (Pa. Super. 2004) (insured's conviction on first degree murder charges stemming from death of infant in insured's care did not preclude potential for coverage where complaint alleged acts of negligence committed by insured also causally contributed to the infant's death).

The allegations contained in the individual homeowners' complaints do not indicate that all grounds for liability against defendants necessarily will directly or inferentially establish an intent to harm the homeowners. While the complaints are replete with allegations that defendants failed to explain the repercussions of the proposed financial transactions in question fully and accurately and that defendants advanced their own self interests at the expense of the homeowners, the allegations in the complaints also raise the potential for liability based upon negligent business practices. While the allegations that USA Financial's agents (1) knew or should have known that the consumers could not afford the monthly payments on the loans in question and (2) failed to advise the applicants of the full financial repercussions flowing from various aspects of the proposed refinancing will support an inference that defendants acted with the intent to advance their own financial interests over those of the homeowners, they equally raise inferences that at least some potential breaches of duty could have been the result of sloppy or poor business practices. In other words, the allegations of the complaints do not conclusively eliminate the potential for liability based on negligence and/or uninformed conduct. And it is well recognized that negligent misrepresentation in context of a mortgage transaction can constitute an "occurrence" within the meaning of a CGL policy. See First Newton National Bank, 426 N.W.2d at 625 (complaint containing allegations of fraud and negligent misrepresentation against mortgage bank raised an occurrence and thus triggered the duty to defend); Sheets v. Brethren Mutl. Ins. Co., 679 A.2d 540, 545-51 (complaint averring causes of action for fraud and negligent misrepresentation presented an "occurrence" under general liability policy); Wood v. Safeco Ins. Co. of America, 980 S.W.2d 43, 50-53 (Mo. Ct. App. 1998) (same) (surveying cases and reasoning that claims that are grounded in negligence and do not require an intent to deceive are not removed from the scope of coverage merely because claims for

intentional deception are also included in the complaint).

Furthermore, specific review of the causes of action fairly raised by the allegations of the homeowners' complaints indicates actual deception or an intent to deceive need not be proven in order to establish recovery. The General Assembly of Pennsylvania enacted the Unfair Trade Practices and Consumer Protection Law to prohibit a wide variety of both deceptive and unfair business practices. Com. ex. rel. Zimmerman v. Nickel, 26 Pa. D. & C.3d 115, 119 (Pa. Comm. Pl. 1983). While its general aim is the prevention of fraud, any act or practice that has a capacity or tendency to deceive falls within the ambit of the act. Id. at 120 (citing Resort Car Rental Sys., Inc., v. Capital FTC, 518 F.2d 962, 964 (9th Cir. 1975)). Neither an intent to deceive nor actual deception need be proven to establish liability. Id. (citing Warner Lambert Co. v. FTC, 562 F.2d 749, 763 (D.C. Cir. 1977) and Montgomery Ward Co. v. FTC, 379 F.2d 666, 672 (7th Cir. 1967)). And an act or practice need not be proven to be deceptive in order to be declared "unfair" - which necessarily involves consideration of a variety of factors including whether the practice causes substantial injury to consumers or others. Id. (citing FTC v. Sperry and Hutchinson Co., 405 U.S. 233, 244-45 n.5 (1972)).

Similarly, liability may be imposed under Pennsylvania's Credit Services Act for "any statement which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known to be untrue or misleading" used or made in the process of establishing credit with respect to a consumer's credit worthiness, credit standing or credit capacity. See 73 P. S. § 2183(3). Liability also may be established by a misleading representation that merely operates or has the potential to operate in a deceptive manner. See 73 P. S. § 2183(4). In addition, a violation of the Credit Services Act can be established merely by a "credit services organization's" failure to provide certain information, including information about services and fees prior to the execution of a mortgage and/or the failure to provide the mortgagor with the right to cancel within 5 days of signing. In re Bell, 309 B.R. 139, 162 (Bkrtcy. E.D. Pa. 2004). No showing of intent to harm or defraud is required. Id.

Pennsylvania law also recognizes that a claim for breach of fiduciary duty may be based on a negligent failure to act in good faith and solely for the benefit of the principal in any particular transaction. See PENNSYLVANIA STANDARD JURY INSTRUCTIONS § 4.16 (Civ.); Sylvester v. Beck, 178 A.2d 755, 757 (Pa. 1962) (breach of duty of loyalty may be established where agent fails to give principal all information on the subject matter that has come to his attention.) Furthermore, an agency relationship can arise between a mortgagor and an agent for a mortgagee, and the failure to exercise the appropriate level of care under the attendant circumstances can support a finding of breach of a fiduciary duty. Garbish v. Malvern Federal Sav. & Loan Ass'n., 517 A.2d 547, 554-55 (Pa. Super. 1986).

As the above makes clear, liability under the various theories of recovery raised in the homeowners' complaints can be imposed for negligent misrepresentation and/or failure to disclose certain information mandated under Pennsylvania law. Liability for such conduct would necessarily contain an element of fortuity. Thus, there is at least a prima facia basis upon which to assume that any covered loss arising out of the litigation would be fortuitous. Thus, defendants' initial burden in establishing an occurrence is satisfied.

Morever, Westfield has failed to come forward with any evidence that demonstrates defendants intended to cause the homeowners to breach their mortgage agreements and/or suffer foreclosure and loss of their homes. The lack of evidence to support a finding that defendants harbored such subjective intent precludes a finding at this juncture that defendants intended to cause damage or injury of the same general type for which they may be held accountable. Consequently, Westfield's attempt to rely on the "intended or expected" exclusion to absolve itself of the duty to defend the claims by the homeowners is unavailing.[1]

---

[1]Westfield's reliance on USX Corp. is misplaced. There, the insured's liability had been established through a jury verdict that had become final and the underlying record had established a presumption of the insured's intent to cause the same general type of harm which gave rise to the liability. The insured failed to overcome that presumption. USX Corp., 99 F. Supp. 2d at 631. Here, in contrast, several avenues for establishing liability against the insureds remain open, some of which are inconsistent with the notion that they intended or expected to

Westfield's effort to confine any insurable loss to a time outside the time during which the policies were in effect also is unavailing. Westfield argues that the individual homeowners' claims are based on contracts that predate the inception of the first policy, which became effective on September 27, 1999. Defendants argue that any injuries to the homeowners caused by defendants' conduct did not manifest until the policies were in effect, thus making coverage available.

It is well-settled under Pennsylvania law "that the determination of when an occurrence happens must be made by reference to the time when the injurious affects of the occurrence took place." Appalachian Ins. Co., v. Liberty Mut. Ins. Co., 676 F.2d 56, 61-62 (3d Cir. 1982). In other words, "the aspect of the occurrence which must take place within the policy period ... is the 'result,' that is the time when the accident or injurious exposure produces [the covered] injury." Id. at 62 (quoting Eagle Picher Indus., v. Liberty Mutual Ins. Co., 523 F. Supp. 110, 114 (D. Mass. 1981) (other citations omitted)). The Superior Court of Pennsylvania likewise has adopted the "effect" test for determining whether an occurrence took place within a particular policy period. Keystone Automated Equipment Co., Inc., v. Reliance Ins. Co., 535 A.2d 648, 651 (Pa. Super. 1988) ("in any case, following the reasoning of the Third Circuit Court of Appeals, it seems clear that the 'effect' test is applicable to a determination of place of occurrence as well as of time."). In other words, "an occurrence happens when injury is reasonable apparent, not at the time the injury occurs. The cause and the injury may happen at very distinct time periods." D'Auria, 507 A.2d at 862.

Here, the injury for which coverage may ultimately prove to be available is the loss of use of the individual homeowners' residences. While the contracts defendants brokered may have been the first event in a causal chain leading to the foreclosures, there is no basis in the record to suggest that such foreclosures were reasonably apparent at the moment the contracts were signed. To the contrary, it appears that the foreclosures, judgments and sheriff's sales did not occur until there had been continuous and repeated exposure to the harmful conditions created by the mortgage

---

bring about the covered injury or damages in question, or acted in a manner that reflects "the type of pernicious mischief which Pennsylvania public policy prohibits being shifted to an insurer." USX Corp., 99 F. Supp.2d at 634.

transactions. Because the record creates a presumption that the likelihood of foreclosure was not reasonably apparent prior to September 27, 1999, and the foreclosures themselves actually occurred or had the potential to actually occur during the time the policies were in effect, the fact that the loan transactions themselves occurred prior to September 27, 1999, is not a basis to relieve Westfield of its duty to defend the individual homeowner cases.

Westfield's contention that neither Campisi nor USA Financial was an "insured" at the relevant time is unavailing for the same reason. Mark Campisi became the sole owner of USA Financial on January 1, 1999. Because both he and USA Financial were named insureds during the entire time the policies were in effect, the fact that USA Financial was jointly owned by another individual when the underlying contracts were written does not change the fact that both Campisi and USA Financial were insureds when the occurrence and potentially covered injuries manifested themselves in a manner that triggered Westfield's duty to defend.

For the reasons set forth below, plaintiff's motion for summary judgment will be granted in part and denied in part. A declaration indicating plaintiff has no duty to defend in the AG and Neptune actions will be entered. The motion will be denied with regard to the actions commenced by the individual homeowners and a declaration will be entered indicating plaintiff has a duty to defend defendants in those actions. Defendants' motion for judgment on the pleadings, which the court has construed as a cross motion for summary judgment, will be grant to the extent it seeks relief consistent with the court's disposition of plaintiff's motion for summary judgment and denied in all other aspects. An appropriate order will follow.

David Stewart Cercone
United States District Judge

31

cc:    Meghan F. Wise, Esquire
Zimmer Kunz
600 Grant Street
3300 US Steel Tower
Pittsburgh, PA 15219

Matthew F. Marshall, Esquire
Dillon, McCandless, King, Coulter & Graham
Cranberry Professional Park
501 Smith Drive
Suite 3
Cranberry Township, PA 16066